El Pueblo de Puerto Rico, demandante y apelado, *v.* Emilio Dumas Cartro, acusado y apelante.

Núm. 6543.—*Sometido:* Junio 15, 1937.  *Resuelto:* Junio 25, 1937.

*C. H. Juliá,* abogado del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

El apelante fué acusado de un delito de asesinato y declarado culpable de homicidio voluntario. Su primer señalamiento lee así:

"La corte inferior cometió error al declarar sin lugar la moción de suspensión presentada por el abogado designado de oficio a las doce del día cuando se estaba ya seleccionando el jurado."

Los hechos que aparecen del récord son los siguientes:

El delito que se imputa al acusado fué cometido el día 20 de octubre de 1934 y el día 22 de noviembre del mismo año tuvo lugar el acto de la lectura de la acusación, compareciendo el acusado en persona, quien informó a la corte que su abogado era el licenciado Alfonso Lastra Charriez, hizo alegación de inocencia y solicitó juicio por jurado. La vista del caso fué señalada para el día 16 de febrero de 1935 y suspendida por haber alegado el acusado que se encontraba enfermo.

Señalado el caso para juicio el 15 de octubre de 1935, al ser llamada la causa compareció el abogado Ramírez Viñas, en representación del abogado de récord Alfonso Lastra Charriez, y solicitó la suspensión de la vista, por el motivo de encontrarse enfermo el acusado. La corte designó al Dr. Arsenio Comas para que examinara al acusado e informara a la corte si éste estaba o no enfermo. Informó dicho facultativo que el acusado estaba en condiciones de poder comparecer a juicio, y entonces la corte ordenó el arresto del acusado. Y no habiendo comparecido el abogado de récord,

la corte nombró abogado de oficio al licenciado Carlos H. Juliá, invitándole para que procediera a examinar y seleccionar el jurado que había de conocer del caso. Dicho abogado solicitó la suspensión de la vista hasta las dos de la tarde de ese mismo día para él poder determinar si podía o estaba en condiciones de hacerse cargo del caso. La corte resolvió que debía continuarse la constitución del jurado, para seguir el juicio a las dos y media de la tarde. Se avino a ello el abogado defensor, quien representó al acusado en la selección del jurado, el que quedó constituído sin que ocurriera incidente alguno: El abogado defensor solicitó entonces que se le concediese tiempo para prepararse antes de entrar a juicio. La corte le concedió hasta las cuatro de la tarde para que pudiera entrevistarse con los testigos de defensa. Tomó excepción la defensa por entender que el término concedídole no era razonable.

La corte, sin objeción por parte de la defensa, hizo constar en el récord "que de algún tiempo a esta parte, se está estableciendo la costumbre por los acusados de solicitar la suspensión de sus juicios, y cuando no hay motivos especiales para suspenderlos, o cuando la corte se las deniega, se fingen enfermos y dejan de comparecer a la corte el día señalado para juicio"; que la corte ha ordenado el examen médico de los acusados y que siempre ha resultado que las enfermedades alegadas por éstos son fingidas; que en el caso de autos, cuatro días antes del señalado para el juicio el acusado manifestó a uno de los jurados, fiador de él, que no asistiría al juicio porque su abogado pediría la suspensión; que la moción de suspensión no fué presentada hasta el momento mismo del juicio; que la corte, teniendo motivo para creer que la alegada enfermedad era fingida ordenó el examen del acusado, resultando efectivamente que el acusado no tenía ninguna enfermedad que le impidiese entrar a juicio; que si la corte permitiera la continuación de esa práctica, la celebración de los juicios quedaría a expensas de la voluntad de los acusados; que tratándose de un caso corriente en que

el acusado sin culpa por su parte se ve privado de su abogado, la corte le daría todo el tiempo que fuere necesario, pero tratándose de un acusado que a juicio de la corte, maliciosamente ha tratado de suspender el juicio, dicho acusado no tiene derecho a apelar a la discreción de la corte.

Del récord aparece que la sesión fué reanudada a las 4.25 P. M.; que después de examinar al perito médico y dos testigos de cargo, quienes fueron ampliamente repreguntados por la defensa, la corte se declaró en receso hasta las 9 de la mañana del día siguiente, 16 de octubre de 1935; que el examen y repregunta de los testigos de cargo continuó durante todo el día 16 de octubre de 1935, hasta las 5 P. M., en cuya hora el abogado defensor solicitó y obtuvo la suspensión de la vista hasta el día siguiente, "para esbozar nuestra teoría y empezar con nuestra prueba"; y que el día 17, o sea dos días después de comenzado el juicio, se practicó la prueba del acusado, tendiente a sostener la teoría de la defensa propia, declarando el acusado y cinco testigos, cuyo testimonio cubre setenta páginas de la transcripción de evidencia. No aparece de los autos que el acusado se viera privado de utilizar otras pruebas por razón de no habérsele concedido la posposición solicitada. Y la forma en que el abogado defensor condujo el examen de los testigos nos convence de que el acusado estuvo muy hábilmente defendido y de que nada hubiese ganado con la posposición del juicio.

En el caso de *El Pueblo* v. *Arrocho,* 33 D.P.R. 657, invocado por el apelante, concurrieron hechos y circunstancias completamente distintos a los del presente caso. Era aquél un caso en que los acusados habían sido sentenciados a la pena capital. El delito que se les imputaba había sido cometido el 20 de febrero de 1924. La lectura de la acusación tuvo lugar el 11 de marzo del mismo año y la vista del caso fué señalada para seis días después. Negóse la corte sentenciadora a posponer el juicio. Y esta Corte Suprema revocó la sentencia porque a su juicio a los acusados no se les había dado un tiempo razonable para preparar su defensa.

En el caso ante nos el acusado tuvo tiempo más que súficiente y amplias oportunidades para preparar su defensa. Desde la fecha en que se le leyó la acusación hasta la fijada para la vista transcurrieron diez meses y quince días, durante cuyo período de tiempo el acusado estuvo representado por un abogado de su elección.

La práctica censurable seguida por el acusado apelante al tratar de conseguir la suspensión de la vista mediante falsas representaciones, y el hecho ya consignado de que la denegación de la posposición del juicio no causó perjuicio alguno a los derechos substanciales del acusado, son, a nuestro juicio, suficientes para que resolvamos que la corte inferior no cometió el error que se le imputa.

██ El segundo señalamiento debe desestimarse por ser enteramente frívolo. Convenimos con el apelante en que el hecho de que el acusado y el interfecto trabajaran juntos en unas elecciones primarias celebradas tres meses antes de la fecha en que se cometió el delito, es inmaterial y por sí solo insuficiente para establecer el móvil del crimen. Si hubo algún error al admitir prueba de ese hecho, el error no pudo en manera alguna perjudicar al acusado.

██ El tercer error señalado lee como sigue:

"La corte inferior cometió error al no permitir que el acusado declarase sobre la opinión que tenía formada del interfecto en este caso."

Hagamos una reseña del incidente que motivó este alegado error. El acusado manifestó, a preguntas de su abogado, que conocía al interfecto, aun cuando no había tenido tratos con él. Preguntóle entonces la defensa: "¿Qué opinión tenía usted formada del muerto en este caso?" Se opuso el fiscal, solicitando se retirara el Jurado mientras se discutía el punto legal levantado por su oposición. Discutida la cuestión fuera de la presencia del jurado, la corte la resolvió, de acuerdo con la argumentación del fiscal, en la siguiente forma:

"Juez: Eso solamente lo sabrá el propio acusado, porque el temor que pueda una persona tener de otra persona no lo puede declarar más que esa persona, porque es un estado psíquico, algo interno que no lo sabe nada más que esa persona. Si se lo dice a otra sería referencia. Por eso, el acusado debe manifestarlo. Para la defensa propia tiene que admitir la muerte, pero que la produjo en defensa propia, y entonces, si quiere hacer uso de la doctrina del peligro aparente, entonces debe demostrarse que realmente sentía y que anteriormente sentía ese temor, y de la única manera es que lo diga el acusado. Nadie puede declarar lo que piensa o siente otra persona.

"Defensa: Tomamos excepción de la resolución de la corte por entender, que habiéndose sentado las bases de que el acusado fué quien dió la muerte, el acusado está en su perfecto derecho, ahora, de indicar qué concepto le merecía la reputación del interfecto a él cuando produjo la muerte.

"Juez: Si sentáramos esa doctrina llegaríamos a un resultado absurdo, de que por el hecho de que una persona tiene mala reputación estaría a expensas de que cualquiera le privase de la vida, por tener mala reputación. Puede llamar al Jurado. (El Jurado comparece.) Puede continuar con el testigo."

Acto seguido el acusado declaró: Que fué él quien hirió al interfecto y que supo después que éste había muerto; que antes de ocurrir los hechos ya él conocía a Isidro Herrans, el occiso; que había sido informado que el occiso era un hombre criminal; que sabía que el occiso era un hombre terrible, un bandido y que había estado cumpliendo condenas por violación, delito contra natura, por haberle cortado la cabeza a otro, etc.; que conocía al interfecto por una persona peligrosa, que así lo decía todo el pueblo y que él le tenía miedo.

No creemos que la corte cometiera el error que se le imputa, ni tampoco que la resolución de la corte haya podido perjudicar al acusado. A éste se le permitió declarar extensamente sobre la opinión que él tenía formada en cuanto al interfecto y en cuanto a la mala reputación de éste en la comunidad. La decisión de la corte en cuanto a que se debía probar la defensa propia o admitir que el acusado había causado la muerte del interfecto, antes de que la declaración

del acusado sobre el carácter o reputación del interfecto pudiera ser admitido en evidencia, se ajusta a la doctrina legal sentada por la jurisprudencia. Véanse: *El Pueblo* v. *Sutton,* 17 D.P.R. 345 y *El Pueblo* v. *Lamnause,* 30 D.P.R. 732.

La regla general es que no puede admitirse evidencia referente al carácter o reputación de la víctima de un homicidio. El Pueblo no puede ofrecer evidencia primaria para probar que el interfecto era un hombre de buena reputación, quieto y pacífico. Esa prueba por parte del fiscal es admisible solamente en el caso de que el acusado tratare de probar que el interfecto era un hombre de carácter violento y peligroso. La regla en cuanto a la admisibilidad de esa clase de prueba, cuando es ofrecida por la defensa, la define así Corpus Juris:

"No puede probarse el carácter violento, vengativo, sanguinario del interfecto para excusar o atenuar el homicidio, pues la muerte sin que haya habido provocación de un hombre malo es un asesinato, tanto como lo sería la muerte de la persona más pacífica y respetuosa de la ley en la comunidad.

"Cuando se ha presentado evidencia tendiente a probar la defensa propia o las circunstancias en que se realizó el hecho estuvieren en duda, la reputación del interfecto como hombre violento y peligroso puede probarse con el propósito de demostrar que el acusado tenía una razonable aprensión de peligro inminente, especialmente bajo las circunstancias prevalecientes en el momento del homicidio."

30 C. J., secs. 395, 396, y 465, págs. 172, 173 y 229.

El cuarto y último señalamiento dice así:

"La corte inferior cometió error al permitir que el fiscal contrainterrogando al acusado, le preguntase si había cumplido alguna condena, y que le preguntase luego específicamente si había sido condenado por acometimiento y agresión grave."

En contestación a las preguntas del fiscal, el acusado admitió que el cuchillo que le mostraba el ministerio público era el mismo que él había tomado del mostrador. Y al ser preguntado si era verdad que él había afilado el cuchillo, el

acusado respondió: "Yo no ando con un arma así." Entonces siguió este diálogo:

"P.—¿No ha sido condenado por portar armas?

"R.—Por portar un revólver, sí.

"P.—¿Pero usted cumplió una condena?

"R.—Sí, señor, 30 días, o sea 25. Eso ocurrió hace como 12 años.

"Fiscal:—¿Había sido condenado por acometimiento y agresión grave?

"R.—¿En dónde?"

Pidió entonces el abogado defensor que se retirara el Jurado. En ausencia del jurado se argumentó la oposición de la defensa a que el acusado contestara la pregunta del fiscal, por entender que la prueba era inadmisible toda vez que el acusado no había presentado evidencia de su buena reputación. Sostuvo la corte que habiendo declarado el acusado que él nunca portaba armas, el fiscal tenía derecho a preguntarle si había sido convicto del delito de portarlas, no para probar la mala reputación del acusado, sino para impugnar su veracidad. El fiscal retiró entonces su pregunta, que había quedado pendiente de contestación, y a solicitud de la defensa se ordenó su eliminación del récord. No llegó a cometerse, pues, el segundo error comprendido en este señalamiento. Tampoco cometió la corte el primero. El fiscal estuvo justificado al impugnar la veracidad del acusado en la forma en que lo hizo. El acusado no puede ser obligado a declarar, pero cuando hace uso de su derecho a ocupar la silla testifical, desde ese momento está sujeto a todas las reglas de evidencia al igual que cualquiera otro testigo.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado Señor Córdova Dávila no intervino.