EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* TOMÁS DÍAZ DÍAZ, acusado y apelante.

*Números:* CR-63-321, CR-63-322       *Resueltos:* 19 de febrero de 1965

760

*Ángel Viera Martínez,* abogado del apelante; *J. B. Fernández Badillo, Procurador General,* y *Manuel Tirado Viera, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Presidente Interino Señor Pérez Pimentel y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

PER CURIAM: De una extensa transcripción de evidencia —consta de 867 folios—el apelante ha entresacado varios incidentes aislados para formular varios de los diez apuntamientos de error que señala para solicitar la revocación de las sentencias que le fueran impuestas por los delitos de asesinato en segundo grado y portación ilegal de armas. [1] Para conveniencia de la discusión adoptamos una clasificación lógica de los errores, y así, los consideraremos en el siguiente orden: a) los relativos a actuaciones o interven-

[1] Tanto el juez a quo como este Tribunal declararon sin lugar solicitudes para que se admitiera fianza mientras se tramitaba la apelación.

ciones del tribunal mientras los testigos prestaban testimonio (errores primero y segundo) ; b) los relacionados con la admisión o exclusión de prueba ofrecida por las partes (errores tercero, cuarto y décimo) ; c) las impugnaciones a las instrucciones (errores sexto, séptimo y octavo) ; y, finalmente, d) los que se dirigen a la suficiencia de la prueba (errores noveno y décimo).

■ a) Prácticamente el primer incidente que se escoge para afirmar que el apelante no tuvo un juicio imparcial se reduce a una cuestión de pura semántica. Descansa en la connotación que pretende dársele a la palabra *ahora* usada por el tribunal al decir: "Basta. Está clara la situación. El testigo admitió haberle dicho al fiscal que Tomás [el acusado] le había dicho que le dijera a Daniel [la víctima] que no fuera más al negocio. Ahora, niega haberle dicho al fiscal que Tomás hubiera dicho que lo iba a matar si iba al negocio" (T.E. págs. 668–669). Una lectura de la declaración del testigo Luis Vázquez Sandoval indica fuera de toda duda que el vocablo no se usó en su significado como adverbio de tiempo— en este momento—sino como conjunción continuativa, sirviendo para anunciar o introducir un pensamiento. La mejor corroboración de ello es que la frase que le sigue está precedida por una coma. De todas formas el incidente carece de importancia alguna porque en el examen redirecto dicho testigo reafirmó una y otra vez, en una ocasión a preguntas del juez, que el apelante nada le había mandado a decir a la víctima.

■ Se queja además de la "continua e innecesaria" intervención del juez de instancia interrogando activamente testigos, argumentando planteamientos de la defensa y haciendo comentarios y dictámenes extemporáneos. Aun cuando se señalan numerosos incidentes en los cuales intervino el magistrado, su actuación respondió a la facultad que tiene el tribunal para esclarecer los hechos, y tomados en conjunto no puede decirse que transgredan la norma que discutimos en

*Pueblo* v. *Aletriz*, 85 D.P.R. 646 (1962). No puede afirmarse que la teoría del Pueblo fue establecida mediante el interrogatorio o las intervenciones del juez. El récord demuestra palmariamente que esta misión que corresponde al fiscal fue cumplida por dicho funcionario exclusivamente y que el juez se limitó más bien a aclarar ciertos hechos, sobre todo si se considera que se trataba de un proceso prolongado y dentro del cual se pretendió por ambas partes escrutar e investigar los más mínimos detalles. Realmente las preguntas del juez en la mayoría de las ocasiones se referían a aspectos sin importancia y que no eran decisivas para juzgar la culpabilidad o inocencia del acusado, a meras trivialidades. Véanse, *Pueblo* v. *Martell Cajigas*, 88 D.P.R. 636 (1963); *Pueblo* v. *Andrades González*, 83 D.P.R. 849 (1961) y *Pueblo* v. *Rivera Romero*, 83 D.P.R. 471 (1961).

■ b) Por el tercer error se sostiene que el tribunal no permitió a la defensa preguntar a los testigos de cargo sobre (1) el carácter violento, agresivo e impulsivo del occiso; (2) su costumbre de usar armas; y, (3) la ocurrencia de un incidente entre el apelante y el interfecto con anterioridad a la fecha de la muerte. Presumiendo que las resoluciones del juez a quo fueran erróneas, cf. *Pueblo* v. *Dumas*, 51 D.P.R. 844 (1938), ningún perjuicio se le causó con ello al apelante, pues en su turno de presentación de prueba—después de anunciar al concluir la prueba de cargo que su teoría era la de defensa propia—ofreció testimonios que tendían a establecer precisamente estos hechos. Véase, además, Jones, *Evidence*, § 172, en donde se dice que "para que el acusado pueda presentar evidencia sobre el carácter agresivo y pendenciero de la víctima de su agresión es preciso que previamente haya establecido las bases que tiendan a sostener que actuó en defensa propia."

■ Insiste en que era improcedente la admisión de unas manifestaciones supuestamente hechas por el acusado en el curso de la investigación, aduciendo que se obtuvieron por

presión indebida. Independientemente del hecho de que el apelante negó haber hecho las manifestaciones—"de que el interfecto le metió el pie al acusado y éste fue a su casa, trajo un revólver y le disparó"—todo cuando surge de la prueba es que Díaz Díaz había sido advertido por un abogado que le había asistido de su derecho a no declarar y que el fiscal le interrogó por espacio de no más de 30 minutos inquiriéndole sobre los móviles del crimen. Consciente de su derecho a permanecer en silencio, y sin que mediara coacción física de clase alguna, fue que optó por hacer las manifestaciones que se le atribuyen. *Pueblo* v. *Cruz Jiménez*, 87 D.P.R. 133 (1963).

■ El décimo error se refiere a la actuación del tribunal al permitirle al fiscal formular preguntas sugestivas. La mejor contestación a este planteamiento la hace el propio apelante en su alegato cuando afirma que "No creemos que un caso debe revocarse porque se hagan unas meras preguntas sugestivas." En un gran número de los ejemplos señalados no se trataba de preguntas sugestivas, y en la mayoría de los casos versaba sobre detalles insustanciales.

■ c) Arguye el apelante que fue lesionado por la negativa del juez a transmitir al jurado ciertas instrucciones solicitadas sobre su "condición alcohólica" en el momento de la comisión de los hechos. Aunque de la prueba surge que Díaz Díaz había ingerido ron, no hay nada que demuestre que se encontraba en un estado de embriaguez que le incapacitara para formar o concebir el propósito, la intención o la malicia que son elementos del delito de asesinato. *Pueblo* v. *Febres*, 78 D.P.R. 893 (1956); *Pueblo* v. *Rivera*, 70 D.P.R. 570 (1949). *Pueblo* v. *Rosado*, 78 D.P.R. 436 (1955), es claramente distinguible.

■ También sostiene que son erróneas las instrucciones sobre portación ilegal de armas y que omitió darlas sobre el alcance y extensión de una licencia para tener y poseer un arma y sobre su portación incidental. Se basa en parte este

apuntamiento en el hecho de que el apelànte tenía una licencia expedida por el Jefe de la Policía para, como argumenta, tener un arma en su finca, y los hechos ocurrieron en un establecimiento de su propiedad sito dentro de la finca. La dificultad estriba en que el negocio en sí no pertenecía al acusado; estaba arrendado a una tercera persona. Por otro lado la prueba ofrecida por el propio apelante no justificaba que se le dieran al jurado instrucciones sobre portación incidental, pues establece que él fue allí a esperar a cierta persona que le iba a entregar un dinero, y que entró al negocio "a tomarse el traguito de ron *nada más*" (T.E. pág. 748).

d) Los errores señalados al efecto de que los veredictos son contrarios a la prueba y a derecho son claramente frívolos. Creída como lo fue, la prueba de cargo los justifica plenamente. *Pueblo* v. *Barreto Pérez*, 85 D.P.R. 752 (1962).

Los otros planteamientos incidentales no requieren discusión. Si algo puede afirmarse es que el jurado fue sumamente generoso con el apelante al traer un veredicto de asesinato en segundo grado.

*Se confirmarán las sentencias dictadas por el Tribunal Superior, Sala de San Juan, en 28 de mayo de 1963.*